IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERMEC TECHNOLOGIES CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-272-SLR |
| | ) | |
| PALM INC., | ) | |
| Defendant. | ) | |

Jack B. Blumenfeld, Esquire and Rodger Dallery Smith, II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware.  Counsel for Plaintiff and Counterclaim Defendant.  Of Counsel: Carson P. Veach, Esquire, Leland W. Hutchinson, Jr., Esquire, David S. Becker, Esquire and Jacob D. Koering, Esquire of Freeborn & Peters LLP.

Richard L. Horwitz, Esquire and David Ellis Moore, Esquire of Potter Anderson & Corroon, LLP, Wilmington, Delaware.  Counsel for Defendant and Counterclaim Plaintiff.  Of Counsel:  Robert T. Haslam, Esquire, Michael M. Markman, Esquire, and Robert J. Williams, Esquire of Covington & Burling LLP.

**MEMORANDUM OPINION**

Dated:  September 15, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On May 18, 2007, Intermec Technologies Corporation ("Intermec" or "plaintiff")

filed an action against Palm, Inc. ("Palm" or "defendant") for infringement of U.S. Patent

Nos. 5,349,678 ("the '678 patent"), 5,568,645 ("the '645 patent"), 5,987,499 ("the '499

patent"), 5,468,947 ("the '947 patent"), and 5,892,971 ("the '971 patent", collectively "the

Intermec patents"). (D.I. 1)  Palm filed its answer on July 2, 2007, and thereafter

amended it twice. (D.I. 7; D.I. 11; D.I. 17)  On September 11, 2007, Intermec filed a

motion to strike Palm's inequitable conduct defense from its second amended answer.

(D.I. 23)  The parties stipulated, on May 23, 2008, that Intermec would withdraw its

motion to strike, and that Palm would submit its third amended answer, attached thereto

as exhibit 1. (D.I. 48)  Palm's third amended answer includes various defenses and

counterclaims, two of the latter asserting infringement of Palm's U.S. Patent Nos.

6,665,803 ("the '803 patent") and 7,096,049 ("the '049 patent", collectively "the Palm

patents").

The court issued a memorandum order on June 7, 2010 denying both Palm's

motion to strike certain evidence and argument pertaining to invalidity of the Palm

patents (D.I. 210) and Intermec's cross-motion to strike supplemental opinions of Dr.

Kevin Almeroth ("Dr. Almeroth") regarding infringement of the '803 patent (D.I. 249).

(D.I. 270)  On June 16, 2010, the parties stipulated as to supplemental briefing relating

to Intermec's motion for summary judgment of noninfringement and invalidity of the

Palm patents (D.I. 162). (D.I. 271)

On September 14, 2010, the court issued a memorandum opinion with respect to the Intermec patents, granting-in-part and denying-in-part Palm's motion for summary judgment of indefiniteness (D.I. 151); denying Intermec's motion for partial summary judgment of infringement (D.I. 152); granting-in-part and denying-in-part Intermec's motion for partial summary judgment of certain invalidity claims (D.I. 155); granting Palm's motion for summary judgment of noninfringement (D.I. 158); and granting-in-part and denying-in-part Intermec's motion for summary judgment of infringement and validity (D.I. 159). (D.I. 284) Both parties agreed to mediation of the case which was scheduled for December 14, 2010. (D.I. 288; D.I. 289) The parties stipulated, on February 16, 2011, to stay all claims regarding the Palm patents until the conclusion of mediation. (D.I. 291)

On March 22, 2011, Intermec filed a notice of appeal to the Federal Circuit concerning the parties' stipulated judgment of noninfringement of the Intermec patents, which the Federal Circuit docketed on April 6. (D.I. 303) On May 5, 2011, the parties reported to the court that "efforts to mediate the case have not been successful." (*Id.*) After consideration of the parties' respective positions on how to proceed with issues relating to the Palm patents, the court lifted the stay. (D.I. 304)

Currently pending before the court is Intermec's motion for summary judgment of noninfringement and invalidity of the Palm patents (D.I. 162) and Palm's motion for summary judgment of no invalidity and infringement of the Palm patents (D.I. 175). Fact and expert discovery is now closed. Trial has not yet been scheduled. This court has jurisdiction under 28 U.S.C. § 1338(a) and 35 U.S.C. § 101 et seq.

## II. BACKGROUND

### A. The Parties and Patents in Suit

Intermec is incorporated under the laws of the State of Delaware, and has its principal place of business in Everett, Washington. Intermec is a wholly owned subsidiary of Intermec, Inc. Norand Corporation ("Norand") of Cedar Rapids, Iowa, is the assignee of the Intermec patents. In 1997, Norand was acquired by Intermec, who owns all right and title to the Intermec patents. Intermec makes and sells data capture equipment such as portable data collection terminals and wireless communication systems to support them, bar code readers which may be incorporated into a terminal or provided as an attachment, and handheld computers that can connect to the internet and be used as cell phones. The Intermec patents relate to data capture systems, data capture terminals, and bar code readers. The data capture systems are comprised of computer systems communicating over radio transceivers to matching transceivers in the data capture terminals. Intermec does not offer cellular subscription services.

Palm is incorporated under the laws of the State of Delaware, and has its principal place of business in Sunnyvale, California. Palm provides smartphones, cellular telephones that include the ability to run certain programs such as a calendar application. Smartphones are also capable of connecting with the internet, thereby enabling other applications such as email and web browsing. Internet applications require a cellular data service subscription with a cell phone carrier. Palm does not offer cellular subscription services.

The '803 patent was filed on November 4, 2002 as a continuation of application No. 09/298,113, filed April 23, 1999. The '803 patent issued December 16, 2003 and is

4

directed to a portable computer that determines whether an accessory device is connected to it. The '049 patent was filed on May 25, 2001 and issued August 22, 2006. The '049 patent is directed to a handheld computer comprising a rechargeable battery and a radio frequency ("RF") transceiver, wherein the RF transceiver is capable of being powered by the battery and/or a battery recharger under particular circumstances.

### B. Technological Background

Portable computers, including laptop and handheld computers, are often limited in their capabilities when compared to larger, stationary desktop computers. Various peripheral devices may be modified or eliminated when designing a portable computer in order to reduce weight, size and battery drain. Due to their nature, portable computers generally require a battery to power the unit during mobile operation and when away from standard alternating current ("A/C") power. The battery is recharged, or the unit may be directly powered, by an A/C "recharger" connected to the unit's "power terminal".

Additional capabilities are often added to such computers through the use of external accessory devices. Accessory devices have been used, for example, to provide serial, parallel and universal serial bus ("USB") communication ports, modems and additional memory, when connected to a "communication port" of the portable computer. Some accessory devices ("powered accessories") also provide the portable computer with an A/C power supply when connected to the portable computer.

Portable computers are generally equipped with a "time-out" feature that turns the computer off after a predetermined period of user inactivity. This time-out feature

5

preserves battery life when the computer is being operated in a self-contained configuration. This feature is often unnecessary when connected to a powered accessory. In such instance, a time-out feature may not only be unnecessary, but it may actually limit the useful capabilities of the combined portable computer and connected accessory device. For example, an application program might display a "stock ticker" showing current market prices obtained via a communications link. Since the application does not require regular user interaction for such a display, the time-out feature might turn the computer off after the predetermined time, even if powered by the accessory.

While earlier portable computers may have contained a time-out feature, this feature was not disabled when connected to a powered accessory through a communications port. Instead, the time-out feature was only disabled when the computer was attached to an A/C recharger connected directly to the computer's power terminal. Further, earlier portable computers were unable to identify the type of connected accessory, thus placing the burden for doing so on the user. The user, in manually configuring the computer to use the connected accessory, may improperly identify the accessory to the computer. The computer might then accidentally execute an application program that could cause damage to the accessory. To address these issues, portable computers were designed to recognize accessories, including powered accessories, that are connected to a communications port and to respond accordingly. Identifying the type of accessory may also indicate whether or not the accessory provides external power, without resort to detecting the power source itself.

6

All of the issues and limitations discussed above are of critical importance with particular respect to handheld computing devices such as "palmtops," personal digital assistants (PDAs) and handheld computers (collectively "handheld devices" or "handhelds"). Handheld devices are small. They are generally designed to fit in a pocket and weigh less than a pound, severely constraining the size and energy capacity of the battery. These devices typically support some combination of personal information management, database functions, word processing and spreadsheets, as well as wireless functions (such as email and telephony applications).

Wireless functions depend on one or more RF transceivers that require substantial signal amplification for transmission, and additional power for signal reception. Earlier handhelds did not allow RF transmission or reception when the battery charge was depleted below a minimum level, thereby disabling communications functions. A user could then connect the battery and/or the handheld to a recharger. The recharger would restore the battery charge to a level permitting wireless operation. The RF transceiver would remain disabled, however, until the battery charge reached such a level. This problem was later addressed by allowing the power source (recharger) to provide at least some of the power to the RF transceiver during battery charging, permitting the use of wireless functions simultaneous with charging.

### C. Asserted Claims

Palm asserts three independent claims of the each of the two patents. Included in these independent claims are a total of six typographical errors as noted (in bold) in the recitations that follow. Correction of these typographical errors is an issue in dispute as discussed below.

7

### 1. The '803 patent

Palm asserts infringement of claims 1-30 of the '803 patent, of which claims 1, 12

and 23 are in independent form.  (D.I. 163 at 5)  The asserted independent claims of the

'803 patent read as follows:

1. A method for operating a portable computing device, the method comprising:
    coupling a signal line accessible through an outlet of the portable
        computing device to a communication device;
    detecting a signal on the signal line to determine whether the
        communication device is actively connected to a portable
        computing device; and
    suspending execution of a programmed event that was to occur at a
        subsequent moment in time in order to reduce power consumption
        of the portable computing device.

12. A detachable assembly, comprising:
    a communication device; and
    a portable computing device **adapted[sic]** that is detachably coupleable to
        the communication device, the portable computing device including:
        a signal line that is adapted to couple to an output node of the
            communication device; and
        a processor coupled to the signal line, wherein the processor is
            configured to determine when the communication device is
            actively connected to the portable computing device;
            wherein the processor is programmed to suspend execution
                of a programmed event that would have otherwise
                occurred at a **susbequent[sic]** moment in time in
                order to reduce power consumption of the portable
                computing device.

23. A portable computing device, comprising:
    a signal line accessible through an outlet of the portable computing device
        to a communication device;
    a processor **counted[sic]** to the signal line, wherein the processor is
        configured to determine when the communication device is actively
        connected to the portable computing device; and
    wherein the processor is configured to suspend execution of a
        programmed event that would have otherwise occurred at a
        subsequent moment in time.

### 2. The '049 patent

Palm asserts infringement of claims 1-7 and 9-17 of the '049 patent, of which

claims 1, 7 and 14 are in independent form.  (D.I. 163 at 5)  The asserted independent

claims of the '049 patent read as follows:

> 1. A handheld computer system, comprising:
>> a housing;
>> a display supported by the housing;
>> a processor coupled to the display;
>> a rechargeable battery configured to power the processor and the display;
>> a recharging connector coupled to the rechargeable battery;
>> a recharger coupled to the recharging connector; and
>> a radio frequency transceiver coupled to the processor and powerable by the battery when the battery has a charge above a low level, the transceiver configured to send and receive data while the battery charge is below the low level and the recharger provides charge to the rechargeable battery and to the transceiver, the low level being a level at which the battery is unable to power the transceiver when the charge is below the low level.

> 7. A method of transmitting data over a radio frequency (RF) link from a handheld computer having a low battery charge, comprising:
>> providing the handheld computer **wit[sic]** a rechargeable battery having a relatively low charge, the relatively low charges being too low to transmit information using a transceiver of the handheld computer;
>> coupling the handheld computer to a recharger;
>> providing power from the recharger to the transceiver of the handheld computer and the battery while the handheld computer is coupled to the recharger;
>> establishing an RF link using the transceiver while the battery has a relatively low charge and the handheld computer is coupled to the recharger.

> 14. A handheld computer, comprising:
>> a housing;
>> a display supported **byte[sic]** housing;
>> a processor coupled to the display;
>> a rechargeable battery configured to power the processor and the display;
>> a recharging connector coupled to the rechargeable battery; and
>> a radio frequency (RF) transceiver coupled to the processor and powerable by the battery when the battery has a charge above a low level, the transceiver configured to send and receive data while the **bakery[sic]** charge is below the low level and the recharging connector receives power from a power source and provides power

to the rechargeable battery and to the transceiver, the low level being a level at which the battery is unable to power the transceiver when the charge is below the low level.

### D. The Accused Product

Palm accuses the Intermec CN3 product of infringing the Palm patents. (D.I. 163 at 5; D.I. 209 at 1) The CN3 is a portable, handheld computing device containing one or more RF transceivers. (D.I. 170, tab 101 at IA002824-27; D.I. 178, ex. 39 at ¶ 64-65) The CN3 can use the transceiver to communicate over the internet, allowing it, for example, to send and receive email and download programs. (*Id.*) It also can connect to a cellular service provider to make telephone calls. (*Id.*) The CN3 is built on the Windows Mobile 5.0 operating system and can execute most applications developed for the Windows Mobile platform. (*Id.*; D.I. 168, tab 68 at IA001565-71) The CN3 is contained in a single housing that includes an integrated display as depicted in a drawing taken from the user's manual. (D.I. 178, ex. 39 at ¶ 65; *id.*, attached ex. D at 2) A docking station accessory provides both battery charging capability and data communication connections through a 16-pin connector. (D.I. 165, tab 2 at IA000005-06; D.I. 178, ex. 39 at ¶ 65) This connector includes pins to carry power and various signals between the CN3 and the docking station including one described as "[d]etection [s]ignal pulled low of the CN3 when placed into a docking station" ("DOCK_DET"). (D.I. 165, tab 2 at IA000006; D.I. 178, ex. 39 at ¶ 68)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

10

entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). The moving party bears

the burden of proving that no genuine issue of material fact exists. *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

which a rational person could conclude that the position of the person with the burden of

proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57

F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has

demonstrated an absence of material fact, the nonmoving party then "must come

forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*,

475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e)). The court will "view the underlying facts

and all reasonable inferences therefrom in the light most favorable to the party opposing

the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere

existence of some evidence in support of the nonmoving party, however, will not be

sufficient for denial of a motion for summary judgment; there must be enough evidence

to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a

sufficient showing on an essential element of its case with respect to which it has the

burden of proof, the moving party is entitled to judgment as a matter of law. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Correction of Typographical Errors

As a preliminary matter, Intermec argues that claims 12 and 23 of the '803 patent

and claims 7 and 14 of the '049 patent ("typo claims") are "nonsensical" as written, in

that they contain errors, that Palm has failed to seek correction of these errors from the United States Patent and Trademark Office ("PTO"), that the court lacks jurisdiction to correct these errors, and that Palm has failed to show that Intermec infringes these claims as written.[1] (D.I. 163 at 5-6,17-19; D.I. 180, ex. B at 5, 10, 14-15; D.I. 246 at 9) Palm responds that the typo claims contain typographical errors, that the court has jurisdiction to correct these errors, and proposes corrections for these errors. (D.I. 180, ex. B at 5, 10, 14-15; D.I. 209 at 5-8)

### 1. Standards

"'[A] district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'" *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009) (*quoting Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). Determining whether an error in a patent is correctable by the court is a two-step process. *See Fargo Electronics, Inc. v. Iris, Ltd., Inc.,* 287 Fed. Appx. 96, 101-02 (Fed. Cir. 2008) (*citing Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed.Cir.2005)). First, the court must find that the error is evident on the face of the patent; second, the specification and claims, as well as the prosecution history, are to be consulted in order to ascertain whether there is only a single reasonable construction. (*Id.*) "Absent evidence of culpability or intent to deceive by delaying formal correction, a patent should not be invalidated based on an obvious administrative error." *Hoffer*, 405 F.3d at 1331.

---

[1]Claims 13-22 and 24-30 of the '803 patent and claims 9-13 and 15-17 of the '049 patent depend from the typo claims.

## 2. The typo claims

Palm identifies six alleged typographical errors ("typos") in the Palm patents and offers corrections, as to four of the typos, based on language in applicants' amendment after non-final rejection dated April 12, 2004:

| Patent, term | Published language | File history |
|---|---|---|
| '803 patent, term 23.1 | "a processor **counted** to a signal line" | "a processor **coupled** to a signal line" |
| '049 patent, term 7.1 | "providing the handheld computer **wit** a rechargeable battery" | "providing the handheld computer **with** a rechargeable battery" |
| '049 patent, term 14(a) | "a display **supported byte** housing | "a display **supported by the** housing" |
| '049 patent, term 14(b) | "the transceiver configured to send and receive data while the **bakery** charge is below the low level" | "the transceiver configured to send and receive data while the **battery** charge is below the low level" |

Table 1

(D.I. 180, ex. B at 10, 14-15; D.I. 209 at 5-6) (emphasis modified)

Palm argues that the remaining two typos comprise an obvious misspelling and an obvious extraneous word:

| Patent, term | Published language | Alleged nature of error and proposed correction |
|---|---|---|
| '803 patent, term 12.3 | "a portable computing device **adapted** that is detachably coupleable to a communication device" | extraneous word "adapted" should be deleted |
| '803 patent, term 12.8 | "programmed to suspend execution of a programmed event that would have otherwise occurred at a **susbequent** moment in time." | misspelled word "susbequent" should be "subsequent" |

13

Table 2

(D.I. 180, ex. B at 5-6; D.I. 209 at 5-6) (emphasis modified)

Intermec argues, as to each of the six typos, that "[t]his claim limitation is
nonsensical as written, and the specification does not include any language by which a
reasonable construction of the phrase . . . can be achieved." (D.I. 180, ex. B at 5, 10,
14, 15) There is no dispute, therefore, that on the face of the patent, all six typos are
obvious errors.

There can be no reasonable debate about the proper correction of the first group
of typos as shown in table 1 above, given the file history and considering the
specification and claims. (See, e.g., '803 patent at col. 12:48; '049 patent at col. 1:60-
65, 2:2-5, 11-13, 21-29, 38-43, 3:57-62, 5:12, 20-23, 6:19-20, 45-49, 53-55)

With respect to term 12.3 of the '803 patent, the file history shows: "(Currently
Amended) A detachable assembly, comprising: a communication device; and a
portable computing device adapted ~~to couple~~that is detachably coupleable to the
communication device." (D.I. 178, ex. 38 at 4-5) The original read: "a portable
computing device adapted to couple to the communication device." It is obvious that
the word adapted should have been removed as part of the deletion of "to couple." As
to term 12.8, "susbequent" is a clear misspelling of the word "subsequent" caused by
transposition of the letters "s" and "b," and merits no further discussion. Intermec offers
no correction, reasonable or otherwise, for these typos. The court finds that the typo
claims contain typographical errors that are obvious on the face of the  patent, that there
can be no reasonable debate regarding their correction as discussed above and

14

therefore construes the claims to include the corrections discussed above.

## B. Claim Construction

The parties arguments regarding infringement and validity are based, in considerable measure, on their proposed claim construction for the various asserted claims. Having heard oral argument on, and having reviewed the papers submitted in connection with, the parties' proposed claim construction, the court construes the disputed claim language, consistent with the tenets of claim construction set forth by the Unites States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), as discussed below in the context of these arguments.

## C. Infringement

Palm seeks summary judgment of infringement of claims 18 and 22 of the '803 patent and claims 1, 4-6, 16 and 17 of the '049 patent. (D.I. 175; D.I. 176 at 16, 24, 27) Claims 18 and 22 of the '803 patent ultimately depend from independent claim 12. ('803 patent at col. 12:61-13:39) Claims 4-6 of the '049 patent ultimately depend from independent claim 1, and claims 16-17 ultimately depend from independent claim 14. ('049 patent at col. 5:33-6:35) As to both patents, Intermec counters that Palm has failed to adduce sufficient evidence to carry its burden at summary judgment.[2] (D.I. 201

---

[2]Intermec, relying on *Zenith Electronics Corp. v. PDI Communication Systems, Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008), argues that Palm only cites "mass numbers of pages of the report of [Dr. Almeroth]," and does not identify what factual contentions in the report it is relying on. *Zenith* was a case wherein the movant "provided no evidence whatsoever that the [accused product] satisfie[d] the final two limitations of claim 1." *Zenith*, 522 F.3d at 1363. *Zenith* is easily distinguished from the present case. Intermec is not arguing here that Palm has failed to provide evidence of all limitations but, rather, the evidence is not contained within the four corners of Palm's motion, and that the references to such evidence are painted broadly. This argument is unavailing.

at 25) Intermec's arguments in opposition to Palm's motion are subsumed in Intermec's motion for summary judgment of noninfringement.

Intermec seeks summary judgment of noninfringement of the asserted claims of the '803 and '049 patents.[3] (D.I. 162) Intermec argues three points regarding the independent claims of the '803 patent: (1) that the DOCK_DET signal does not comport with the "signal on a signal line limitation;" (2) that the CN3 switches modes instead of suspending a future programmed event; and (3) that the CN3's power-management features are not suspended in response to detecting a signal on a signal line. (D.I. 163 at 19-20; D.I. 201 at 1-2, 26, 30-32; D.I. 246 at 1-2, 5) Intermec further argues that the CN3 does not execute a downloaded program as required by claims 18 and 22 of the '803 patent. (D.I. 201 at 26-27) As to the independent claims of the '049 patent, Intermec argues that the CN3 does not meet the "low level" limitation. (D.I. 163 at 21-22; D.I. 201 at 2, 28-29, 32-33; D.I. 246 at 1-2, 6-7) With respect to dependent claim 17 of the '049 patent, Intermec argues that the CN3 lacks an "always-on email program" and that Palm has failed to show that the email program on the CN3 "periodically checks for new email messages without further user intervention." (D.I. 201 at 34)

### 1. Standards

---

Although it is helpful to the court to quote and pin cite at least key portions of the record when citing to evidence in expert reports, it is not feasible to recite the contents of entire claim charts and other evidence contained in expert reports, particularly where the record comprises thousands of pages, as in this case.

[3]Claims 1-30 of the '803 patent and claims 1-7 and 9-17 of the '049 patent

To prove direct infringement, the patentee must establish, by a preponderance of the evidence, that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *See Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Significant to the case at bar, if an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).

To prove infringement by the doctrine of equivalents, a patentee must provide "particularized testimony and linking argument" as to the "insubstantiality of the differences" between the claimed invention and the accused product, or with respect to the function/way/result test. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

Establishing the literal infringement of a means-plus-function limitation "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed.Cir. 1999). A patentee may show structural equivalence "if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve

17

substantially the same result as the corresponding structure described in the specification." *Id.* The *Odetics* court differentiated between the "similar analysis" of equivalents under the doctrine of equivalents and 35 U.S.C. § 112, ¶ 6, noting that a component by component analysis is not required to establish structural equivalence in the latter. *Id.* Indeed, such an analysis would be improper to the extent that

> [t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function . . . . The appropriate degree of specificity is provided by the statute itself; the relevant structure is that which "corresponds" to the claimed function. Further deconstruction or parsing is incorrect.

*Id.* at 1268 (internal citations omitted). Conversely, the relevant structure does not include "structure 'unrelated to the recited function' disclosed in the patent . . . ." *Id.* (citing *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998)).

To establish indirect infringement, a patent owner has available two theories: active inducement of infringement and contributory infringement. *See* 35 U.S.C. § 271(b) & (c). To establish active inducement of infringement, a patent owner must show that an accused infringer "knew or should have known [their] actions would induce actual infringements." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). To establish contributory infringement, a patent owner must show that an accused infringer sells "a component of a patented machine . . . knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use."

18

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004) (*quoting* 35 U.S.C. § 271 (c)). Liability under either theory, however, depends on the patent owner having first shown direct infringement. *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993).

### 2. The '803 patent

#### a. DOCK_DET as a "signal line"

All three independent claims of the '803 patent have limitations directed to a "signal line" that is used to detect a "communications device." The parties agree that "signal line" means "a line that carries a signal (which may be at a constant voltage value including zero volts) devoted to indicating whether or not the handheld is docked in a communications device." (D.I. 180, ex. B, at 1, 4-5, 10) The parties further agree that "communications device" means "a support for holding the computing device and that provides data transfer capabilities for the computing device with a network or computer." (*Id.*) Having agreed upon the construction of these terms, the parties then dispute the scope of the word "devoted."

Intermec argues that the word "devoted" limits the "signal line" to detecting a connection to a "communications device," as opposed to other types of devices or accessories. (D.I. 201 at 30-31) Intermec then proffers evidence that the CN3's DOCK_DET signal line may be used with other than communications devices, and argues that the DOCK_DET signal line, therefore, cannot be the signal line required by the claims of the '803 patent as asserted by Palm. (*Id.*) In an earlier brief, Intermec discussed this same limitation, explaining that "detecting the [signal] is different than

detecting a connection to external power, and is different than signals used for data

transfer, parity, or 'hot sync' functions," thereby emphasizing limitation of the type of

signal, not the type of device being detected.  (D.I. 163 at 7, ¶ 11)

Palm responds that the '803 patent specification specifically contemplates using

the signal line in connection with a variety of different peripheral devices.  (D.I. 242 at 3-

4)  Further, Palm argues that, when in an infringing configuration where the CN3 is

inserted into a communications device, the DOCK_DET signal line is, in fact, limited to

detecting a connection to a communications device.  (*Id.* at 4)

The independent claims of the '803 patent have no express limitations that

restrict the "signal line" to indicating coupling exclusively with a communications device.

Nor is such a limitation shown to be inherent by the specification.  The specification of

the '803 patent describes an embodiment wherein

> the portable computer may include a signal line accessible through an
> output of the portable computing device.  The signal line **may** be
> connected to a communication device such as a communication cradle.
> The portable computer may detect a signal on the signal line to determine
> whether the communication device is actively connected to the portable
> computer.

('803 patent, Abstract) (emphasis added)  Similar references to permissive coupling with

a communication cradle, or to coupling with accessories generally, are to be found

throughout the remainder of the specification.  (*See, e.g., id.* at col. 7:66-8:2, col. 9:17-

21, 45-52, col. 11:10-14, 30-33)

The court concludes that the "signal line" of the asserted claims is not limited to

detecting a specific type of accessory such as a communications device.  The court,

therefore, construes "signal line" to mean "a line that carries a signal (which may be at a

constant voltage value including zero volts) distinct from power, data transfer, parity, or 'hot sync' functions, that indicates whether or not the handheld is docked in a communications device, when connected to such device."[4] This construction is consistent with the abstract and the specification: col. 7:66-8:2; col. 9:17-21, 45-52; col. 10:29-31; col. 11:10-14, 30-33.

### b. Mode switching

All three independent claims of the '803 patent include a further limitation directed to suspension of execution of a programmed event scheduled to occur in the future ("suspension").[5] (*Id.* at col. 11:55-56, 12:52-54, 14:5-7) Intermec argues that such suspension is different from switching modes ("mode switching"), that the suspension must be performed without mode switching, and that Palm has failed to prove infringement based on the patent requiring suspension without mode switching. (D.I. 163 at 20) (*citing id.* at 8, ¶ 14)

Intermec's argument regarding the omission of mode switching is based on a response to an office action dated June 13, 2003 ("2003 response"), wherein the independent claims were amended to include the suspension limitation in its final form. (D.I. 167, tab 42) Applicants then distinguished their invention over U.S. Patent No. 5,859,970 to Pleso ("Pleso"), stating:

---

[4]803 patent, claims 1, 12 and 23 (and dependent claims).

[5]Independent claims 1 and 12 also require that the programmed event's objective be reducing power consumption of the portable computing device. (*Id.* at col. 11:56-57, 12:55-56)

> What *Pleaso*[sic] teaches is a power detection circuit that detects when power is received by the portable computer, and then switches a "LAN controller" from a sleep mode to an active mode. [column 2, lines 40-54] This is different than claim 1. In claim 1, a future occurrence of a programmed event is suspended. The portable computing device may already be on, but because of the communication device being detected, a power-reduction event such as a "timeout" is disabled.

> What is not happening in claim 1 is switching an internal computer to an active state in response to detecting power. Rather, a communication device is detected, and in response to detecting the communication device, a programmed event that would reduce power is suspended.

(*Id.* at IA001207-08) Intermec argues that the foregoing ("alleged disavowal")

constitutes a clear disavowal of mode switching. Pleso describes a portable device with

an internal LAN controller and a docking station, where "[u]pon detecting power

received by the portable device from the docking station, the portable device

automatically switches the LAN controller within the device from a low-power

consumption sleep mode to an active mode." Pleso at col. 2:46-50.

"A patentee may, through a clear and unmistakable disavowal in the prosecution

history, surrender certain claim scope to which he would otherwise have an exclusive

right by virtue of the claim language." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d

1317, 1324 (Fed. Cir. 2009) (*citing Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d

1123, 1136 (Fed.Cir.2006)). "Prosecution disclaimer does not apply to an ambiguous

disavowal." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed.

Cir. 2008) (citations omitted). "When the patentee has expressly defined a term in the

specification and remarks made to distinguish claims from the prior art are broader than

necessary to distinguish the prior art, the full breadth of the remark is not a clear and

unambiguous disavowal of claim scope." *3M Innovative Props. Co. v. Avery Dennison*

*Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003). "[A] disavowal, if clear and unambiguous,

can lie in a single distinction among many." *Computer Docking Station*, 519 F.3d at

1377 (*citing Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir.

2007); *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1362 (Fed. Cir. 2005)). "Of

course, a multitude of distinctions may serve to make any single distinction in the group

less clear and unmistakable as the point of distinction over prior art and as a critical

defining point for the invention as a whole. Moreover, the prosecution history must

always receive consideration in context." *Id.* at 1378.

The following excerpts show the relevant changes made by amendment to the

independent claims in the 2003 response:

1. (Currently Amended) . . .
   suspending execution of ~~at least a portion of a program, the portion of the~~
   ~~program~~ a programmed event that was to occur at a subsequent moment
   in time in order to reduce reducing power consumption of the portable
   computing device.

15.[6] (Currently Amended) . . .
   wherein the processor is configured to suspend execution of a
   programmed event that would have otherwise occurred at a
   susbequent[sic] moment in time in order to reduce ~~suspend execution of~~
   ~~at least a portion of a program upon detecting the communications device,~~
   ~~the portion of the program reducing~~ power consumption of the portable
   computing device.

29.[7] (Currently Amended) . . .
   ~~means for suspending execution of at least a portion of a program, the~~
   ~~portion of the program reducing power consumption of the portable~~
   ~~computing device~~wherein the processor is configured to suspend

---

[6]Claim 15 was renumbered to claim 12 prior to issuance. (D.I. 167, tab 42 at IA001201)

[7]Claim 29 was renumbered to claim 23 prior to issuance. (D.I. 167, tab 42 at IA001204)

> execution of a programmed event that would have otherwise occurred at a
> subsequent moment in time.

(D.I. 167, tab 42 at IA001199-1204)

Applicants' amendments here did not remove language relating to mode switching and replace it with suspension of a programmed event. Suspension of a program, or part thereof, was replaced with suspension of a future programmed event. In the first paragraph of the alleged disavowal, applicants distinguished their invention over Pleso by stating what Pleso taught, including switching from a sleep mode to an active mode. Mode switching is not mentioned in applicants' contrasting description of their invention. This is not a clear and unambiguous disavowal of mode switching. Indeed, the 2003 response added a new claim 30, which depends from claim 29, and recites: "wherein the programmed event corresponds to a time-out feature that **switches** the portable computing device **into a low-power mode**, . . ."[8] (*Id.* at 1205) (emphasis added)

### c. Suspending execution in response to detecting a signal

The parties dispute whether or not the suspension limitation is further limited to being "in response to detecting the signal on the signal line," and as to whether the CN3 meets this limitation as construed. (D.I. 149 at 3; D.I. 150 at 36-37; D.I. 180, ex. B at 2)

Palm argues that "requiring that the suspension be in response to detecting the signal on the signal line" is a feature of an embodiment, and its importation into the

---

[8]Claim 30 was renumbered to claim 24 prior to issuance. (D.I. 167, tab 32 at IA001205) Further, claim 14 recites: "The detachable assembly of claim 12, wherein the programmed event corresponds to a time-out feature that switches the portable computing device into a low-power mode.

24

claim language is improper. (D.I. 149 at 3) Palm also argues that the claims require no temporal sequence, as argued by Intermec,[9] and in the alternative, that "the suspension would occur **after** the signal detection, not necessarily **in response to** the detection. Nothing in the claim requires a direct causal relationship." (D.I. 220 at 5) (emphasis retained).

Each disclosure of the suspension in the specification is related to detecting a signal. (See, e.g., '803 patent at col. 2:23-39, col. 3:2-8, col. 6:13-16, 46-50, col. 10:6-11) Moreover, the file history demonstrates that applicants intended that the suspension be in response to detecting the communications device.[10] (See D.I. 167, tab 42 at IA001208 )

The court, therefore, construes "suspending execution of a programmed event that was to occur at a subsequent moment in time" to mean "in response to detecting the signal on the signal line, stopping or postponing the future execution of a programmed event."[11] This construction is consistent with the claims, the specification:

---

[9] Relying on Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1342-43 (Fed. Cir. 2001), Intermec argues that "the steps of a method claim must be performed in the order written when the claim language, specification and prosecution history implicitly require performance in that order." (D.I. 150 at 36) The temporal argument is, thus, limited to claim 1 (a method claim) and is inapplicable to claims 12 and 23 (apparatus claims).

[10] "Claim 15 includes limitations that are similar to claim 1. For reasons stated above, this claim is also allowable." (Id.) Claim 15 was renumbered to claim 12 prior to issuance. (Id. at IA001201) "Claim 29 is similar to claims 1 and 15, except that the limitation recited for how the processor is programmed is: 'the processor is configured to suspend execution of a programmed event that would have otherwise occurred at a subsequent moment in time.'" (Id. at IA001208) Claim 29 was renumbered to claim 23 prior to issuance. (Id. at IA001204)

[11] '803 patent, claims 1, 12 and 23 (and dependent claims).

col. 2:22-28; col. 6:13-6, 46-50; col. 9:60-10:11 and figure 5, as well as the file history (*id.*).

Most of the evidence adduced by Palm, with respect to the suspension, is from Intermec product documentation showing the configuration of power management functions based on the nature of the power source: "battery" or "external power." (D.I. 170, tab 101, ex. C at 13-26)  These documents are not shown to discuss power management configuration based on detecting connection to a communications device. Palm points to a single piece of evidence tying the detection of the communications device to power management, the deposition testimony of 30(b)(6) witness Arvin Danielson ("Danielson"):

> Q:  How – how does the CN3 use the DOCK_DET signal?
> A:  Typically it would know that then it's on an external charger, and it may disable power management.

(D.I. 176 at 19) (*citing* D.I. 178, tab 37 at 231:5-235:14)  Intermec counters this argument with Danielson's declaration, wherein Danielson states that Palm's interpretation of his cited testimony is misleading for two reasons. (D.I. 202)  First, Danielson asserts it is misleading because the referenced statement was in the context of a long discussion related to connecting the CN3 to a powered dock. (*Id.* at 5, ¶ 26) Second, Danielson states that the CN3 uses detection of power, on different pins of the interface than the DOCK_DET signal, to switch between battery and external power modes. (D.I. 202 at 5-6)  The court finds that whether or not the CN3 suspends power management features in response to detecting a signal on a signal line is a genuine issue of material fact, precluding summary judgment of infringement of claims 18 and 22

of the '803 patent. Summary judgment of noninfringement of independent claims 1, 7 and 14 of the '803 patent is similarly precluded.

### d. Execution of a downloaded program

Claim 18 depends from claim 17 which requires that "the portable computing device downloads a program using the communication device once the occurrence of the timeout feature is suspended." Claim 22 contains nearly identical language.[12] Intermec argues that this means the "downloading of the program and the execution of that program are **caused by** and **follow after** the suspension of the timeout feature." (D.I. 201 at 27) (emphasis retained) Palm responds that there is nothing in the claim or specification that would suggest such causality. (D.I. 242 at 6)

The specification supports the contention that such causality exists. The '803 patent is directed to taking action based on the portable computing device detecting an active connection to an accessory. ('803 patent at col. 1:12-15, 2:16-39, figures 5 and 6) The specification teaches that "[a]nother embodiment of this invention provides for detecting whether a communication accessory, such as a communication cradle, is actively connected to the portable computer. The portable computer then suspends a time-out feature" and "[t]he portable computer 100 may use the communication cradle 150 for the purpose of downloading." (*Id.* at col. 3:2-6, 4:24-25)

Beyond the issue of causality, the dispute here is not over a term having special meaning to a person of ordinary skill in the art. Instead, it relates to the plain meaning

---

[12]Although the parties agree, with respect to claim 22, that "once" means "upon suspension of the time-out feature."

of the word "once." As used in claim 17, "once" is a subordinating conjunction. The dictionary defines "once," when used as a conjunction, as "at the moment when."[13]

The court, therefore, construes "the portable computing device downloads a program using the communication[s] device once the occurrence of the time-out feature is suspended" to mean "the portable computing device, without further user intervention, downloads a program using the communications device as soon as the time-out feature is suspended."[14] This construction is consistent with claim 18 and the specification: col. 1:12-15, 2:16-39; col. 3:2-6; col. 4:24-25 and figures 5 and 6, and flows from the plain and ordinary meaning of "once."

Palm argues that claims 18[15] and 22 are infringed because it is possible for the CN3 to "download an upgrade operating system" and the upgraded operating system program can display the current time or a digital image. This argument is unavailing as it is based on Palm's proposed claim construction wherein the downloading was not caused by suspension, and need not occur as soon as suspension took place. Palm points to no evidence that the CN3, without further user intervention, downloads a program using the communications device or executes a program as soon as the time-out feature is suspended. Consequently, the court finds no infringement of claims 17, 18 and 22 of the '803 patent.

### 3. The '049 patent

---

[13] *See* Frederick C. Mish, ed., *Merriam-Webster's Collegiate® Dictionary* 866 (11th ed. 2003).

[14] '803 patent, claim 17 (and dependent claims). Claim 22 is similarly construed.

[15] And thereby, claim 17 from which claim 18 depends.

### a. "Low level"

The asserted independent claims of the '049 patent all contain a limitation with respect to a "low level" of battery charge or a "relatively low charge" (collectively "low level limitation").[16] ('049 patent at col. 5:19-27, 44-54, 6:18-27)  For example, claim 1 recites:

> [(1)] a radio frequency transceiver coupled to the processor and powerable by the battery when the battery has a charge above a low level, [(2)] the transceiver configured to send and receive data while the battery charge is below the low level and the recharger provides charge to the rechargeable battery and to the transceiver, [(3)] the low level being a level at which the battery is unable to power the transceiver when the charge is below the low level.

('049 patent at col. 5:19-27) (brackets added)  The language of claim 14 is nearly identical.  (*Id.* at col. 5:19-27)  The plain and ordinary meaning of the claim language clearly imposes three conditions, requiring no construction.  Expressed graphically, this corresponds to:

| Battery charge | Power Source | |
| --- | --- | --- |
| | Battery | External power to battery and transceiver through recharging connector |
| Above "low level" | **(1)** Transceiver operable | **(Unspecified)** |
| "Low level" ------------------------------------------------------------------------------------- | | |
| Below "low level" | **(3)** Transceiver not operable | **(2)** Transceiver operable |

Diagram 1.

---

[16]Palm asserts infringement of claims including or depending from independent claims 1, 7 and 14, and excluding independent claim 20.

Claim 7 is a method claim containing similar limitations, with the omission of the limitation requiring that the transceiver be operable when the battery has a charge above a "relatively low charge" (i.e., condition (1)).

Intermec presents three arguments regarding the low level limitation. First, Intermec argues that there must be a "specific battery level below which (a) the transceiver on the CN3 will operate on external power; and (b) will not operate on battery power at that voltage level." (D.I. 201 at 2, 32; D.I. 246 at 2) This argument roughly corresponds to conditions (2) and (3). Second, Intermec argues that there must be a "battery voltage level at which (1) the device is operational, but (2) the radio receiver is not" (D.I. 163 at 2, 21; D.I. 201 at 28; D.I. 246 at 2). Intermec fails to point to support in the claims, specification, or file history for this construction. The claim language at issue does not introduce limitations directed to operation of the handheld computer or processor as opposed to the transceiver. Third, Intermec argues that "[c]laim 1 requires a device to (1) be connected to external power, and (2) to power the transceiver by the battery in that configuration." (D.I. 201 at 29) Intermec points to no language here that has special meaning to a person of ordinary skill in the art; a plain reading of claim 1 evidences no such limitation. Intermec further argues that proof of infringement requires identification of a specific voltage level meeting the low level limitation, and that Palm has failed to so identify the voltage level corresponding to the low level. (D.I. 163 at 22; D.I. 201 at 32) To prove infringement, Palm need only show that a low level exists, such that it comports with the conditions specified by the claims. Identification of an empirical voltage level is not required. Indeed, the claims do not

30

even require that the battery charge level be measured in volts or any other particular unit of measure.

Both parties proffer the opinions of their experts, supported by product documentation and physical testing, as to whether or not the CN3 meets the "low level" limitation. (D.I. 176 at 24-29; D.I. 201 at 18-21) The court finds that these arguments reduce to a dispute between experts, requiring the weighing of evidence. A genuine issue of material fact exists as to this limitation of the independent claims at issue and, therefore, summary judgment of infringement is precluded.

### b. "Always-on e-mail"

Claim 17 of the '049 patent recites: "The handheld computer of claim 15, wherein the computer program is an always-on e-mail program." The parties dispute the construction of "always-on e-mail program." Intermec argues that this limitation means "[a]n e-mail program that constantly and continuously checks for new e-mail messages." (D.I. 180, ex. B at 16) In support of this argument, Intermec points to the definition, in a computer dictionary, of "[a]lways on" as "[a]n Internet connection that is maintained continuously, whether or not the computer user is on line." (D.I. 150 at 40) This definition does not speak to the entire limitation at issue and, in fact, relates only to an Internet connection, not an e-mail program. Palm argues, based on the opinion of Dr. Almeroth, that the limitation means "[a]n e-mail program that can periodically check for new e-mail messages without requiring further user interaction." (D.I. 180, ex. B at 16)

Both the claims and the specification of the '049 patent distinguish between "e-mail" and "always-on e-mail," although the nature of the distinction is not expressly

indicated. (See, e.g., '049 patent at col. 3:9-13 and claims 16-17) Claims 16 and 17 are identical save the distinction between an ordinary e-mail program and an always-on e-mail program. Claim 15, from which claims 16 and 17 both depend, recites: "The handheld computer of claim 14, further comprising: a computer program running on the processor, the computer program configured to request access to the RF transceiver." (Id. at col. 6:28-32) Both types of program, therefore, must request access to the RF transceiver. The specification teaches:

> Accordingly, a user may utilize RF transceiver 330 while charging battery 320, even if battery 320 has a charge below a low minimum level. Further, as may be desired, for example, in a device configured for an "always-on" e-mail application, RF transceiver 330 will continue to receive e-mail or be enabled to provide other types of RF communications while battery 320 is being charged.

(Id. at col. 4:50-54) The computer dictionary definition proffered by Intermec is in accord with the specification here, pointing to a conclusion that "always on" is associated with a network connection that is continuously available regardless of whether the computer user is "on line." An "always-on e-mail program" must take advantage of an always-on network connection as compared to an ordinary "e-mail program."

The court, therefore, construes "always-on e-mail program" to mean "an e-mail program that can periodically check for new e-mail messages using an always-on RF network connection without requiring further user interaction."[17] This construction is

---

[17]'049 patent, claim 17.

consistent with claims 15, 16 and the specification: col. 3:9-13; col. 4:34-54; col. 6:28-32.

Intermec argues that Palm has failed to adduce evidence that the accused always-on e-mail program, Microsoft Outlook, "periodically checks for new email messages without further user intervention," asserting that Palm only points to evidence that the email program makes use of the POP3 and IMAP4 protocols without further explanation. (D.I. 201 at 29) Palm responds that it has provided a "detailed element by element claim chart citing[sic] setting forth, and describing the evidence that the CN3 infringes each element with explanatory text and expert opinion." (D.I. 242 at 14) (citing D.I. 213, ex. 43, attached ex. D at 84-105, 107-09)[18] The evidence contained in Dr. Almeroth's infringement report is in accord with Intermec's allegations. (D.I. 213, ex. 43, attached ex. D at 111-14) (discussing infringement of claims 15-17) The evidence points to the use of Microsoft Outlook, and to use of the POP3 and IMAP protocols, but lacks any showing that messages are (periodically) received without user intervention. Although the version of Microsoft Outlook present on the CN3 may, in fact, have this capability, Palm has failed to adduce such evidence of record. The court, therefore, finds no infringement of claim 17 of the '049 patent.

### D. Invalidity

#### 1. Indefiniteness, enablement and written description

##### a. Standards

_____

[18]The cited page ranges, in fact, discuss claims 11-14.

## (1) Indefiniteness

Indefiniteness is a question of law. *Amgen Inc. v. F. Hoffman-LA Roche Ltd.*,

580 F.3d 1340, 1371 (Fed. Cir. 2009) (*citing Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306,

1319 (Fed. Cir. 2008)). That is, "[a] determination that a patent claim is invalid for

failure to meet the definiteness requirement of 35 U.S.C. § 112 [¶ 2] is a legal

conclusion that is drawn from the court's performance of its duty as the construer of

patent claims[.]" *Biomedino, LLC v. Waters Technologies Corp.*, 490 F.3d 946, 949

(Fed. Cir. 2007) (citation omitted); *see also Exxon Research and Engineering Co. v.*

*U.S.*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (rejecting argument that underlying

questions of fact may preclude summary judgment on indefiniteness, as "a court may

consider or reject certain extrinsic evidence in resolving disputes en route to

pronouncing the meaning of claim language").

Section 112 requires that a patent "shall conclude with one or more claims

particularly pointing out and distinctly claiming the subject matter which the applicant

regards as his invention." 35 U.S.C. § 112, ¶ 2. As explained by the Federal Circuit,

> [t]he primary purpose of the definiteness requirement is to ensure that the claims
> are written in such a way that they give notice to the public of the extent of the
> legal protection afforded by the patent, so that interested members of the public,
> e.g., competitors of the patent owner, can determine whether or not they infringe.

*All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779-80 (Fed. Cir.

2002) (*citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28-29

(1997)). In other words,

> [a] patent holder should know what he owns, and the public should know
> what he does not. For this reason, the patent laws require inventors to

34

describe their work in "full, clear, concise, and exact terms," 35 U.S.C. §
112, as part of the delicate balance the law attempts to maintain between
inventors, who rely on the promise of the law to bring the invention forth,
and the public, which should be encouraged to pursue innovations,
creations, and new ideas beyond the inventor's exclusive rights.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002).

A determination as to whether the definiteness requirement has been met

"requires construction of the claims according to the familiar canons of claim

construction." *All Dental Prodx, LLC,* 309 F.3d at 779-80.  Claims that are not

amenable to construction or are insolubly ambiguous are indefinite.  *Halliburton Energy*

*Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).  As with every

construction issue, the focus of the indefiniteness inquiry is on the meaning that claim

terms would have to one of ordinary skill in the art "at the time of the invention, i.e., as of

the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313 *(citing*

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed.

Cir. 2004)).

Although a patentee need not define his invention with mathematical precision in

order to comply with the definiteness requirement, *In re Marosi*, 710 F.2d 799, 802-03

(Fed. Cir. 1983), a claim is deemed sufficiently definite only if "one skilled in the art

would understand the bounds of the claim when read in light of the specification."

*Exxon Res. & Eng'g Co. v. U.S.*, 265 F.3d at 1375.  Therefore, even if a claim term's

definition can be reduced to words, it "is still indefinite if a person of ordinary skill in the

art cannot translate the definition into meaningfully precise claim scope." *Halliburton*,

514 F.3d at 1251.  In this regard, a claim term is indefinite if the patent does not provide

an "objective anchor" or "yardstick against which potential infringers may measure their activities." *Girafa.com v. IAC Search & Media, Inc.*, Civ. No. 07-787-SLR, 2009 WL 3074712, at *2 (D. Del. Sept. 25, 2009).

In sum, the indefiniteness standard of 35 U.S.C. § 112, ¶ 2 is met "where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Id.* Because both claim construction and indefiniteness are questions of law, these issues are amenable to summary judgment.

## (2) Enablement

The statutory basis for the enablement requirement is found in 35 U.S.C. § 112, paragraph 1, which provides in relevant part:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.

The Federal Circuit has explained that "patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable . . . . Tossing out the mere germ of an idea does not constitute enabling disclosure." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). To satisfy the enablement requirement, a specification must teach those skilled in the art how to make and to use the full scope of the claimed invention without undue experimentation. *Genentech*, 108 F.3d at 1365. The

specification need not teach what is well known in the art. *Hybritech v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).

"If an invention pertains to an art where the results are predictable, . . . a broad claim can be enabled by disclosure of a single embodiment . . . and is not invalid for lack of enablement simply because it reads on another embodiment of the invention which is inadequately disclosed." *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1534 (Fed. Cir. 1987) (citations omitted).

The enablement requirement is a question of law based on underlying factual inquiries. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).  Enablement is determined as of the filing date of the patent application.  *In re Brana*, 51 F.3d, 1560, 1567 n.19 (Fed. Cir. 1995).  The use of prophetic examples does not automatically make a patent non-enabling.  The burden is on one challenging validity to show, by clear and convincing evidence, that the prophetic examples together with the other parts of the specification are not enabling.  *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1577 (Fed. Cir. 1984).

Some experimentation may be necessary in order to practice a claimed invention; the amount of experimentation, however, "must not be unduly extensive." *Id.* at 1576.

> The test for whether undue experimentation would have been required is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the invention claimed.

*PPG Indus. Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996) (*quoting Ex parte Jackson*, 217 U.S.P.Q. 804, 807 (1982)).  A court may consider several factors in determining whether undue experimentation is required to practice a claimed invention, including:  (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (6) the predictability of the art; and (7) the breadth of the claims.  *Wands*, 858 F.2d at 737.  These factors are sometimes referred to as the "Wands factors."  A court need not consider every one of the Wands factors in its analysis.  Rather, a court is only required to consider those factors relevant to the facts of the case.  *See Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).

### (3) Written description

"Written description is a statutory requirement set forth in 35 U.S.C. § 112." *Billups-Rothenberg, Inc. v. Associated Reg'l and Univ. Pathologists, Inc.*, No. 2010–1401, 2011 WL 1601996, at *4 (Fed. Cir. Apr. 29, 2011).  "The written description requirement requires the inventor to disclose the claimed invention so as to 'allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'"  *Id.* (*quoting Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)) (brackets in original).  The "level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at

1351 *(citing Capon v. Eshhar*, 418 F.3d 1349, 1357–58 (Fed.Cir.2005)). "To overcome the presumption of validity of patents, the accused must show that the claims lack a written description by clear and convincing evidence." *Hynix Semiconductor Inc. v Rambus Inc.*, Nos. 2009–1299, 2009–1347, 2011 WL 1815978, at *12 (Fed. Cir. May 13, 2011) *(citing ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed.Cir.2009)).

### b. Claims 3 and 9 of the '049 patent

Claim 3 of the '049 patent recites: "The handheld computer system of claim 1, wherein the recharger includes a recharger connector configured to couple to the recharging connector." Claim 9 of the '049 patent recites: "The method of claim 7, further comprising: coupling the handheld computer to a synchronization cradle, the synchronization cradle having a charger connector." Intermec asserts that: (1) the specification does not provide a definition of the terms "recharger connector" or "charger connector" as used in claims 3 and 9; (2) neither is shown in the figures of the '049 patent; (3) "there is no dictionary definition for the terms;" (4) figure 3 shows the recharger connected directly between a power source and the recharging connector; and (5) figure 3 is the only figure that depicts the recharger. (D.I. 163 at 27-28) As a result, Intermec argues "[c]laim 3 fails for indefiniteness and for lack of enablement and written description," and that claim 9 fails similarly. (D.I. 150 at 40; D.I. 163 at 28-29) Intermec, however, has no apparent difficulty in understanding the term "recharger" as used in its invalidity argument: "Finally, Koenck '523 discloses . . . a recharger for recharging the rechargeable battery." (D.I. 163 at 26)

"In some cases, the ordinary meaning of claim language as understood by a

person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (*citing Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). Intermec does not argue that the terms "recharger," "charger," or "connector" have any special meaning to one of ordinary skill in the art. The language of claim 3, itself, defines a "recharger connector" as a "connector configured to couple to the recharging connector," which is included as part of the recharger. ('049 patent at col. 5:30-32) Chargers/rechargers were as ubiquitous at the time of the '049 patent application as they are now, and the dictionary defines both as devices for charging storage batteries.[19] Claim 3 is not indefinite merely because the recharger is only shown in a single figure, sans the recharger connector. "[A]n applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001). As these terms are amenable to construction, they are not indefinite. Intermec fails to point to evidence that claims 3 and 9 of the '049 patent are invalid for lack of enablement or written description.

### 2. Anticipation

#### a. Standards

Under 35 U.S.C. § 102(a), "[a] person shall be entitled to a patent unless the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the

---

[19]*See* Frederick C. Mish, ed., *Merriam-Webster's Collegiate® Dictionary* 208, 1038 (11th ed. 2003).

applicant for patent." A claim is anticipated only if each and every limitation as set forth in the claim is found, either expressly or inherently described, in a single prior art reference. *Verdegaal Bros., Inc. v. Union Oil Co.*, 814 F.2d 628, 631 (Fed. Cir. 1987).

> [A]nticipation requires that each limitation of a claim must be found in a single reference. Although [the Federal Circuit has] permitted the use of additional references to confirm the contents of the allegedly anticipating reference, . . . we have made clear that anticipation does not permit an additional reference to supply a missing claim limitation.

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002). That is, additional references may be used only to shed light on what a prior art reference would have meant to those skilled in the art at that time, not for a specific teaching, as this would be indicative of an attempt to improperly "combine the teachings of the references to build an anticipation." *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.*, 726 F.2d 724, 727 (Fed. Cir. 1984).

A single prior art reference may expressly anticipate a claim where the reference explicitly discloses each and every claim limitation. However, the prior art need not be *ipsissimis verbis* (i.e., use identical words as those recited in the claims) to be expressly anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984). A single prior art reference also may anticipate a claim where one of ordinary skill in the art would have understood each and every claim limitation to have been disclosed inherently in the reference. *Continental Can Co. USA Inc. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. *Id.* That is, "the mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* "[I]nherency

41

operates to anticipate entire inventions as well as single limitations within an invention."
*Schering Corp. v. Geneva Pharms. Inc.*, 339 F.3d 1373, 1380 (Fed. Cir. 2003). The
recognition of an inherent limitation by a person of ordinary skill in the art before the
critical date is not required to establish inherent anticipation. *Id.* at 1377.

An anticipation inquiry involves two steps. First, the court must construe the
claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Lab. Corp.*, 161
F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed
claims against the prior art to determine whether the prior art discloses the claimed
invention. *Id.*

### b. The '803 patent

Intermec alleges that one or more claims of the '803 patent are anticipated by
three earlier Intermec products, the 944X Trakker Reader ("Trakker") and the Intermec
6620 and 6640 models.

### (1) The Trakker

As an initial matter, the parties dispute whether the Trakker qualifies as prior art
to the '803 patent. (D.I. 163 at 13; D.I. 209 at 14) The '803 patent was filed on
November 4, 2002 as a continuation of application No. 09/298,113, filed April 23, 1999,
and no earlier priority date is claimed. ('803 patent at col. 1:5-6) Intermec proffers the
testimony of its expert, Steven E. Koenck ("Koenck"), that the Trakker was "in use and
on sale at least as early as 1988," more than 10 years before the priority date of the
'803 patent. (D.I. 163 at 13 ¶ 39) (*citing* D.I. 157 at 3 ¶ 5) Palm has not adduced any
evidence to the contrary. Instead, Palm argues that Koenck "points to no evidence
whatsoever – let alone admissible evidence – to support this contention." (D.I. 209 at

15) In his supplemental expert report, Koenck explains that his opinion regarding the priority date of the Trakker is based on a Trakker user manual (marked as copyrighted in 1988 and 1989) and a circuit board in the mating 40D dock marked as copyrighted in 1987 (D.I. 274, ex. C at ¶¶ 28, 31) Printed copyright dates on product documentation and circuit boards are the types of evidence which may reasonably be relied upon by experts in the field to determine an approximate date of manufacture, use, sale or offer for sale of an electronic product so marked. In the absence of any allegation or evidence to the contrary, the court finds that the Trakker is prior art to the '803 patent.

As discussed above, all three independent claims of the '803 patent include a suspension limitation, wherein the suspension must be in response to detecting a signal on a signal line. Intermec asserts Koenck found that "when the Trakker was connected through pin 8 of the connector of the devices to a **powered or unpowered dock or to ground**, the Trakker suspended the automatic shut-off feature that would normally time-out during battery operation," presumably to show that the suspension was in response to the signal and not based merely on detection of external power. (D.I. 273 at 4) (*citing* D.I. 274, ex. C at ¶¶ 39-40) (emphasis added). Intermec admits that "detecting the Docked Signal is different than detecting a connection to power." (D.I. 163 at 7 ¶ 11) The cited portion of Koenck's supplemental expert report does identify a signal, IOSENS,[20] that is alleged to correspond to the signal on a signal line limitation. Significantly, Koenck explains that "the 944X User Manual discloses that the 944X device included power management features that would disable an automatic power-off

---

[20]IOSENS refers to IOSENSE/IOSENS(bar).

feature **in the presence of power**." (D.I. 274, ex. C at ¶ 41) (emphasis added). Koenck further states that he "tested an actual Trakker and determined that this suspension of the automatic shut-off feature occurs when the Trakker is placed in a powered 40D dock." (*Id.*) Koenck makes no reference in the cited sections to testing using an unpowered dock as asserted by Intermec, nor does he state that the suspension is in response to detecting a signal on a signal line. Intermec only attempts to show that the Trakker uses IOSENS to determine it is in a dock, and that placing the Trakker in a dock results in the suspension. (D.I. 282 at 7-8) As the pin connector on the Trakker carries both the IOSENS signal and power, such a showing does not rise to the level of clear and convincing evidence that suspension takes place in response to detecting a signal on a signal line as opposed to merely detecting power. Intermec has failed to show that the Trakker anticipates each and every limitation of the claims of the '803 patent as construed by the court.

### (2) The Intermec 6620 and 6640 models

Intermec did not raise the issue of anticipation of the '803 patent by its model 6620 and 6640 products in its briefs in support of its motion for invalidity of the '803 patent (D.I. 163; D.I. 246). Instead, it was Palm that raised the issue in its opening brief for summary judgment of no invalidity of the '803 patent (D.I. 176) arguing that Koenck, in his expert report on invalidity of the '803 patent (D.I. 178 at tab 33), based his opinions on inadmissible Wikipedia articles. Intermec argues that the 6620 and 6640 products anticipate claims 6, 18 and 22 of the '803 patent, responding that its Chief Technology Officer "can testify and confirm, for example, that the 6640 Product came with the Windows 98 operating system installed . . . ." (D.I. 201 at 36) Palm argues,

inter alia, that such evidence was never before disclosed and will prejudice Palm, that
such evidence is legally insufficient and uncorroborated.

Because the court finds that Intermec has failed to point to evidence of record
that establishes that the 6620 and 6640 products meet every limitation of each of the
alleged anticipated claims, the court does not reach these arguments.  Claims 6, 18 and
22 of the '803 patent are dependent claims that include all of the limitations of the
claims from which they depend.  Assuming arguendo that all of its proffered evidence
were admissible, Intermec has failed to point to evidence that the 6620 and 6640
products meet the suspension limitation of the independent claims of the '803 patent, as
construed by the court.

### c. The '049 patent

#### (1) The Intermec model 700 Mono

Intermec argues that "Palm itself has demonstrated that the '049 patent claims
are invalid by accusing a **prior art product** of infringement, namely Intermec's 700
Mono product."  (D.I. 201 at 37) (emphasis in original)  Intermec points to Palm's
response to its interrogatory number 10, Palm's preliminary infringement contentions
(D.I. 169, tab 87).  (D.I. 201 at 23 ¶ 60)  In addition to disputing the priority of the model
700 Mono, Palm argues that Intermec has failed to show that each element of the
asserted claims of the '049 patent is found in the 700 Mono device, and that Palm never
accused the 700 Mono device of infringement.  Instead, Palm asserts, it considered
accusing the 700 Color device of infringement, but decided not to do so when it
determined that it lacked required elements of the '049 patent claims.

A review of Palm's preliminary infringement contentions shows that references to

45

700 series products were based on user manuals for the 700 Color series computers. The court is unable to locate a single reference to the 700 Mono device in Palm's preliminary infringement contentions which are so heavily relied upon by Intermec. Regardless of whether or not the 700 Mono is prior art to the '049 patent, Intermec has failed to show by clear and convincing evidence that the 700 Mono anticipates any of the claims of the '049 patent.

### (2)  U.S. Patent No. 4,885,523 ("Koenck '523")

Koenck '523 relates to a rechargeable battery conditioning system for batteries used in portable computerized devices, particularly handheld devices that have means for storing data pertinent to battery operating parameters.  (Koenck '523 at col. 1: 33-37) The system provides for significant portions of the conditioning circuitry to be disposed external to the battery operated portable device.  (*Id.* at col. 1:66-2:5)  The disclosed system is particularly advantageous in situations where the portable computing device needs to be recharged away from AC power, such as in delivery operations, where the unit must be maintained in a mobile environment that is subject to extremes in temperature.  (*Id.* at col 1: 48-54)  Such a system allows for optimal battery performance and maximum battery life.  The inventor of Koenck '523 is Steven E. Koenck, Intermec's expert.  (*Id.* at [75])  Koenck '523 incorporates by reference the detailed description of figures 1 through 17 of U.S. Patent No. 4,709,202 to Koenck, et al. ("Koenck '202").[21]

---

[21]"The detailed description of FIGS. 1 through 17 is incorporated herein by reference to the specification at col. 4, line 25, through col. 66, line 4, of the incorporated U.S. Pat. No. 4,709,202."  (Koenck '523 at col. 6:42-45)

Intermec argues that Koenck '523 anticipates the asserted independent claims of

the '049 patent. (D.I. 163 at 26) (*citing* D.I. 174, tab 118 at ¶¶ 34-39, 41-49) Intermec

asserts that Koenck '523 discloses each of the "basic elements" of the product claims –

alleging disclosure of the first five elements of claims 1 and 14[22] plus the sixth element

of claim 1.[23]

The seventh and final element of claim 1 is the low level limitation, common to all

three asserted independent claims, as discussed above. Relying on Koenck's invalidity

report, Intermec further argues that

> Koenck '523 discloses the basic elements of the method claim of Claim 7,
> in that the device includes a rechargeable battery that, by its nature, can
> be discharged, a transceiver that, by its nature, requires power to operate,
> and a recharger for recharging the rechargeable battery."
>
> In addition to disclosing these basic elements, Koenck '523 discloses a
> device that will power the transceiver on the device when plugged into a
> dock. According to Palm, this is all that is required to infringe the claim,
> and presumably to meet the "low level" limitation.

(*Id.* at 26-27) (internal citations omitted)

Palm responds by arguing that Koenck '523 does not teach: (a) a handheld

computer system; (b) a recharger that provides charge to both the battery and the

transceiver **directly**; and (c) a transceiver that can transmit when the power source is

connected but the battery level is too low to power transmission. (D.I. 209 at 21-22)

---

[22]"Specifically, Koenck '523 discloses each of the basic elements of the product claims,
showing a housing, a display supported by the housing, a processor coupled to the
display, a rechargeable battery configured to power the processor and the display, and
a recharging connector coupled to the rechargeable battery." (D.I. 163 at 26) (internal
citations omitted)

[23]"[A] recharger coupled to the recharging connector." ('049 patent at col 5:18)

All asserted independent claims include the term "handheld computer" in the preamble, the one independent method claim including it in the body of the claim as well. The parties dispute the meaning of this term, with Palm arguing that "handheld computer" means "an integrated computing system within a single housing that can be stored in a pocket and used while carried in one hand." (D.I. 149 at 4)  Intermec proposes, that the term should be construed as "[a] computing device that can be easily moved by hand from one location to another during operation." (D.I. 180, ex. B at 12) Neither party offers argument as to why the claim preamble should be construed as a limitation. (*See, e.g.,* D.I. 149 at 4; D.I. 150 at 38; D.I. 220 at 7-8; D.I. 221 at 3-4)  The court finds that the preambles of the asserted independent claims do not recite additional structure or steps underscored as important by the specification and holds, therefore, that the preambles do not impose additional limitations. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Moreover, the specification teaches that "[h]andheld computing devices, 'palmtops,' 'palmhelds,' personal digital assistants (PDAs), or handheld computers **typically** weigh less than a pound and fit in a pocket," thus, not all handheld computers do so. ('049 patent at col. 1:7-9) (emphasis added)  Further, the term "handheld computer" is used in both the '049 patent and Koenck '523,[24] and neither party has shown that a person of ordinary skill in the art would interpret the two uses differently in context.  The court finds that the term "handheld computer" does not require

---

[24]Koenck '523 refers to "hand-held" in reference to various devices, but discloses the more specific "hand-held computer" as an example in a reference to U.S. Ser. No. 104,653, entitled "Hand-held Computer System," which is incorporated by reference in its entirety.  (Koenck '523 at col. 18:38-44)

48

construction, and holds that "handheld computer" is not a limitation of the asserted independent product claims. Assuming arguendo that "handheld computer" was a limitation of the asserted independent product claims of the '049 patent, the court finds that Koenck '523 discloses a handheld computer.

Palm's second and third arguments, (b) and (c) above, are a part of the low level limitation. While the low level limitation requires that the recharger provide charge to both the battery and transceiver through the recharging connector, it does not require that the recharger provide charge to the battery and the transceiver **directly**, as argued by Palm.[25]

Intermec, in reply, argues that Koenck '523 discloses

"an external charger . . . providing power simultaneously to both the internal rechargeable batteries and operating circuitry from[sic] the transceiver . . . "a regulation circuit . . . enabling the portable computer to run independently off either external charger input or the battery," and a "rechargeable battery means that can be drained to a charge too low to power the transceiver" such that "operation of the transceiver is enabled if the battery charge is very low."

(D.I. 246 at 18) (*citing* D.I. 174, tab 118 at ¶ 59, 61, 82) Intermec alleges that the regulation circuit enables the **portable computer** to run independently from the charger or battery, yet fails to point to evidence establishing that the recharger can provide sufficient power to enable the RF transceiver to "send and receive data" as required. The specification of Koenck '523 teaches: "Omission of a current sense resistor such

---

[25]"[T]he recharger provides charge to the rechargeable battery and to the transceiver." ('049 patent at col. 5:23-24) "[P]roviding power from the recharger to the transceiver of the handheld computer and the battery while the hand-held computer is coupled to the recharger." (*Id.* at col. 5:49-51) "[A] recharging connector coupled to the rechargeable battery; and . . . the recharging connector receives power from a power source and provides power to the rechargeable battery and to the transceiver." (*Id.* at col. 6:16-24)

as 24-30 is particularly advantageous where the **battery** is to supply **relatively high peak current** as in portable radio frequency (RF) terminals which communicate data on line to a base computer station [sic] an RF link." (Koenck '523 at cols. 17:67-18:3) (emphasis added) Intermec does not point to evidence that the charge supplied by the **recharger** in Koenck '523 is sufficient to supply this relatively high peak current required of the transceiver when the battery charge is too low to do so. Without a further showing, it is possible that the recharger may provide current sufficient to recharge the battery and to operate other functions of the handheld computer, yet be insufficient to allow concurrent operation of the transceiver. The court finds that Intermec has failed to adduce clear and convincing evidence showing that the low level limitation of the '049 patent is found in Koenck '523 and holds, therefore, that Koenck '523 does not anticipate the claims of the '049 patent.[26]

## V. CONCLUSION

For the aforementioned reasons, Palm's motion for summary judgment of no invalidity and infringement of the '803 and '049 patents is granted-in-part with respect to no invalidity of either patent, and is otherwise denied. Intermec's motion for summary

---

[26]The parties make additional arguments regarding dependent claims of the '049 patent. Because the court finds that the independent claims of the '049 patent are not anticipated, the court does not reach these arguments.

Intermec also briefly raises the issue of obviousness in its reply brief: "Mr. Koenck offers the opinion that, based on Koenck '523 and Miller '183 and his own experience, "it would have been obvious to combine the cradle charger of Miller '183 with the charger of the '523 patent." (D.I. 246 at 18) (*citing* D.I. 174, tab 118 at ¶ 71) Intermec's argument only addresses the additional limitation of claim 2 of the '049 patent and does not offer any explanation as to how Koenck '523 in view of Miller '183 and the knowledge of one of ordinary skill in the art renders each and every element of claim 2 obvious.

judgment of non-infringement and invalidity of the '803 and '049 patents is granted-in-part with respect to no infringement of claims 17, 18 and 22 of the '803 patent and no infringement of claim 17 of the '049 patent, and otherwise denied.

An appropriate order will issue.